UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ETHICON ENDO-SURGERY, INC. and ETHICON ENDO-SURGERY, LLC,

    *Plaintiffs and Counterclaim-Defendants*,

v.

COVIDIEN LP, COVIDIEN SALES LLC, and COVIDIEN AG,

    *Defendants and Counterclaim-Plaintiffs*.

Civil Action No. 1:16-cv-12556-LTS

**LEAVE TO FILE UNREDACTED VERSION UNDER SEAL GRANTED ON AUGUST 10, 2017 (DKT. NO. 77)**

# REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

|      |                                                                                                                                  | Page |
|------|----------------------------------------------------------------------------------------------------------------------------------|------|
| I.   | INTRODUCTION AND SUMMARY OF ARGUMENT                                                                                             | 1    |
| II.  | ETHICON'S INVALIDITY ARGUMENTS HAVE ALREADY BEEN REJECTED                                                                        | 2    |
| III. | COVIDIEN IS LIKELY TO SUCCEED ON INFRINGEMENT                                                                                    | 3    |
|      | A. The Plain And Ordinary Meaning Of The Claim Terms Should Be Adopted                                                           | 3    |
|      | B. The Stop Members in the Enseal X1 are Configured to Maintain a Uniform Distance Between The Sealing Surfaces                  | 4    |
|      |    1. Claim 1 Does Not Require The Stop Members To "Set" The Jaw Gap                                              | 4    |
|      |    2. The Enseal X1 Has a "Uniform" Jaw Gap                                                                       | 6    |
|      | C. The Distal Stop Member In the Enseal X1 Is Non-Conductive                                                                     | 8    |
|      | D. The Preamble in Claim 1 of the '284 Patent is not Limiting                                                                    | 9    |
|      | E. Ethicon's Other Noninfringement Arguments are Meritless                                                                       | 10   |
| IV.  | ETHICON'S INFRINGEMENT IS IRREPARABLY HARMING COVIDIEN                                                                           | 11   |
|      | A. Ethicon Is Using The Enseal X1 To Take Covidien Market Share In The Advanced Bipolar And Other Markets                        | 11   |
|      | B. Ethicon's Conduct Is Likely To Harm Covidien In Other Ways                                                                    | 12   |
| V.   | THERE IS A NEXUS BETWEEN ETHICON'S INFRINGEMENT AND THE HARM TO COVIDIEN                                                         | 13   |
| VI.  | NEITHER THE BALANCE OF HARMS NOR THE PUBLIC INTEREST JUSTIFY ALLOWING ETHICON'S INFRIGNEMENT TO CONTINUE                         | 14   |
| VII. | CONCLUSION                                                                                                                       | 15   |

# TABLE OF AUTHORITIES

Page(s)

CASES

*ActiveVideo Networks, Inc. v. Verizon Comms., Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ................................................................................. 4

*Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002) ................................................................................... 9

*Dentsply Int'l, Inc. v. U.S. Endodonctics, LLC*,
No. 2:14-cv-196, 2015 WL 12672022 (E.D. Tenn. Nov. 20, 2015) .......................... 4

*Fair Isaac Corp. v. Int'l Bus. Mach. Corp.*,
No. 05-2081, 2006 WL 1283852 (D. Minn. May 9, 2006) ........................................ 4

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ............................................................................. 5, 6

*Marine Travelift, Inc. v. ASCOM SpA*,
No. 14-443, 2014 WL 4215925 (E.D. Wisc. Aug. 25, 2014) .................................. 14

*Millipole Corp. v. W.L. Gore & Assocs.*,
No. 11-1453 (ES), 2011 WL 5513193 (D.N.J. Nov. 9, 2011) .................................. 4

*Murata Machinery USA, Inc. v. Daifuku Co., Ltd.*,
No. 2:13-cv-866-DAK, 2016 WL 4287040 (D. Utah Aug. 15, 2016) ....................... 2

*Proctor & Gamble Co. v. Team Techs.*,
No. 1:12-cv-552, 2014 WL 12656554 (S.D. Oh. July 3, 2014) ................................ 3

*Saffran v. Johnson & Johnson*,
712 F.3d 549 (Fed. Cir. 2013) ................................................................................. 10

*Sanofi-Synthelabo v. Apotex*, Inc.,
470 F.3d 1368 (Fed. Cir. 2007) ............................................................................... 12

*Symantec Corp. v. Computer Assocs. Int'l*,
522 F.3d 1279 (Fed. Cir. 2008) ................................................................................ 9

*TAS Energy, Inc. v. Stellar Energy Am., Inc.*,
No. 8:14-cv-3145-T-30MAP, 2015 WL 6156149 (M.D. Fla. Oct. 19, 2015) ........... 2

*Tr. of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ............................................................................... 10

*Trebro Mfg., Inc. v. Firefly Equip., LLC,*
   748 F.3d 1159 (Fed. Cir. 2014)......................................................................................11

*Veracode, Inc. v. Auth., Inc.,*
   137 F.Supp.3d 17 (D. Mass. 2015) ................................................................................13

*Windsurfing Int'l, Inc. v. AMF, Inc.,*
   782 F.2d 995 (Fed. Cir. 1986).........................................................................................14

**STATUTES**

35 U.S.C. § 314(a) .............................................................................................................2, 3

35 U.S.C. § 316(e) ....................................................................................................................3

**OTHER AUTHORITIES**

37 CFR § 42.100(b) ..................................................................................................................3

I.  INTRODUCTION AND SUMMARY OF ARGUMENT

For years, Ethicon has unsuccessfully tried to take significant market share from Covidien's LigaSure products. As a result of its failure, Ethicon began developing the Enseal X1 in the next stage of that effort. REDACTED

Instead, Ethicon attacked the validity of the patent twice via *inter partes* review ("IPR"). Ethicon's petitions were denied.

At that point, Ethicon could have made the responsible decision to simply eliminate the non-conductive stop members from the jaws of the Enseal X1—the same features it now claims are not important for sealing—and eliminate any risk of infringement of the '284 patent. However, Ethicon chose a different path. REDACTED

Moreover, by its own admission, REDACTED

, as required by the '284 patent. Ethicon's cynical approach to Covidien's intellectual property rights reflects Ethicon's desire to bring the Enseal X1 to market as quickly as possible notwithstanding the risk of infringement.

Covidien's motion for a preliminary injunction should be granted. Covidien has demonstrated a high likelihood of success on the merits because Ethicon's REDACTED

in no way prevents the Enseal X1 from infringing claim 1 of the '284 patent, and Ethicon's invalidity attacks simply rehash the same prior art that the PTAB has already rejected in connection with Ethicon's failed IPR petitions regarding the '284 patent.

1

Covidien has already been harmed—and will continue to be harmed—by the sale of the Enseal X1, including through lost market share for LigaSure Impact and other products, and likely price erosion.[1] Ethicon's arguments that the balance of equities and the public interest justify its continued infringement are without merit, particularly where other advanced bipolar devices (including Ethicon's) can be used in lieu of the infringing Enseal X1 product. The Court should grant Covidien's motion and enjoin Ethicon's sale and marketing of the Enseal X1.

## II. ETHICON'S INVALIDITY ARGUMENTS HAVE ALREADY BEEN REJECTED

It is hard to imagine a stronger case for likelihood of success regarding validity when there has already been a determination by the PTAB that Ethicon failed to show even a "reasonable likelihood" that it would prevail on invalidity. 35 U.S.C. § 314(a). Ethicon's invalidity arguments rely on the *exact same prior art* that the PTAB has already considered and rejected in response to Ethicon's two separate IPR petitions regarding the '284 patent. *Compare* Exs. Q; R (relying on U.S. Patent Nos. 5,674,220 ("*Fox*") and 5,891,142 ("*Eggers*")), *with* D.I. 57 ("Opp.") at 20-22. While Ethicon is not estopped from raising invalidity arguments here in litigation, Ethicon's assertion that the IPRs "have no bearing on the validity question" is contrary to the law. *See* Opp. at 20. Indeed, several courts have considered the results of IPR proceedings in ruling on likelihood of success in litigation. *See Murata Machinery USA, Inc. v. Daifuku Co., Ltd.*, No. 2:13-cv-866-DAK, 2016 WL 4287040, at *2 (D. Utah Aug. 15, 2016); *TAS Energy, Inc. v. Stellar Energy Am., Inc.*, No. 8:14-cv-3145-T-30MAP, 2015 WL 6156149,

---

[1] Ethicon's argument that Covidien unduly delayed filing its motion is incorrect. *See* Opp. at 27-28. The Enseal X1 was first launched in March 2017, after which Covidien began seeing the impact of sales of the Enseal X1 on its customer relationships. Covidien's motion was filed on April 29, 2017—less than two months later—after good faith efforts to mediate this dispute. D.I. 32. Ethicon's suggestion that Covidien was compelled to seek injunctive relief before the Enseal X1 was even commercialized and before Covidien was harmed is not supported by the law, and would set a dangerous precedent requiring parties to run to court before evaluating whether an infringing product was actually causing commercial and other harm.

at *7 (M.D. Fla. Oct. 19, 2015); *see also Proctor & Gamble Co. v. Team Techs.*, No. 1:12-cv-552, 2014 WL 12656554, at *10-11 (S.D. Ohio July 3, 2014) (granting summary judgment on validity where same arguments were raised in rejected IPR petition).

Ethicon's failed IPR petitions are highly relevant because its failure to establish even a "reasonable likelihood" of invalidity in the IPR proceedings, under the substantially lower burden of proof and broader claim construction standard in IPR proceedings (*see* 35 U.S.C. §§ 314(a), 316(e); 37 CFR § 42.100(b)), underscores Ethicon's inability to satisfy its higher burden before this Court to prove invalidity by clear and convincing evidence. Indeed, when Ethicon's first IPR petition was filed, nearly 70% of such petitions were granted. Ex. A.[2] Ethicon's speculation that the PTAB must have failed to consider a particular figure from *Eggers* during the IPR is without merit (Opp. at 19-21), and neither that figure nor anything else in the cited art changes the result regarding validity. *See* Supplemental Declaration of William Durfee ("Durfee Decl.") at ¶¶ 46-63. Ethicon's suggestion that the Court should ignore the IPR record is meritless, and Ethicon has failed to demonstrate it is likely to succeed on its invalidity defense.

## III. COVIDIEN IS LIKELY TO SUCCEED ON INFRINGEMENT

Ethicon's opposition identifies several limitations of claim 1 that it contends are not in the Enseal X1 device. Ethicon's arguments seek to inject non-existent limitations into the claims and ignore the realities of advanced bipolar devices and the small measurements at issue.

### A. The Plain And Ordinary Meaning Of The Claim Terms Should Be Adopted

As an initial matter, Ethicon's argument that Covidien's motion should be denied because of a purported failure to address claim construction overstates the law. Opp. at 15-17. The cases cited by Ethicon do not support its argument that a preliminary injunction must be denied unless the movant offers specific constructions for all claim terms, but rather, stand for the proposition

---

[2] All exhibits cited herein are attached to the Declaration of Richard Mulloy filed herewith.

3

that the Court must have a sufficient record to evaluate claim construction issues in deciding the motion. *See Millipole Corp. v. W.L. Gore & Assocs.*, No. 11-1453 (ES), 2011 WL 5513193, at *8-9 (D.N.J. Nov. 9, 2011); *Fair Isaac Corp. v. Int'l Bus. Mach. Corp.*, No. 05-2081, 2006 WL 1283852, at *6-7 (D. Minn. May 9, 2006). Indeed, the only court discussing *Millipole* or *Fair Isaac* in the context of claim construction in a preliminary injunction motion rejected the notion that a movant *must* provide specific constructions in its opening brief. *Dentsply Int'l, Inc. v. U.S. Endodonctics, LLC*, No. 2:14-cv-196, 2015 WL 12672022, at *6 n.4 (E.D. Tenn. Nov. 20, 2015).

Here, Dr. Durfee's infringement analysis is based on the plain and ordinary meaning of the claim terms to a person of ordinary skill in light of the intrinsic patent record. Indeed, many of the terms are clear on their face. *See, e.g.*, D.I. 41 at 7; *see also ActiveVideo Networks, Inc. v. Verizon Comms., Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012) ("The district court did not err in concluding that these terms have plain meanings that do not require additional construction."). Nonetheless, to the extent Ethicon has identified disputes regarding the construction of the terms, Dr. Durfee's accompanying declaration further confirms what the plain and ordinary meaning of the terms would be to a person of ordinary skill. *See* Durfee Decl. at ¶¶ 5-16, 29-31, 33-44.

### B. The Stop Members in the Enseal X1 are Configured to Maintain a Uniform Distance Between The Sealing Surfaces

#### 1. Claim 1 Does Not Require The Stop Members To "Set" The Jaw Gap

Ethicon's argument that the Enseal X1 does not include stop members "configured to maintain a uniform distance between the jaw members" because REDACTED

is contrary to the patent claims and specification. *See* Opp. at 7-11; D.I. 67 at 7-21; D.I. 63 at 1-6. The plain language of claim 1 does not require that the stop members "set" the gap. The claim simply requires that the stop members be "configured to maintain a uniform distance between the

4

jaw members," which means they are "structured to ensure a uniform jaw gap." Durfee Decl., ¶¶ 9-11. Ethicon's attempt to inject a "set the gap" requirement into the claim should be rejected.

Ethicon's "set the gap" argument seems to be that the Enseal X1 cannot have stop members "configured to maintain a uniform distance" REDACTED

Opp. at 4. Ethicon's argument is contrary to the claims of the '284 patent. In particular, dependent claim 2 requires at least two stop members "that extend different heights from the inner facing surface ...." Ex. X at 14:7-11. Claim 1 is broader than claim 2 and thus must include stop members of "different heights" that are also "configured to maintain a uniform distance." *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 909-10 (Fed. Cir. 2004). The specification also states that "one or more of the stop members ... may be dimensioned larger or smaller than the other stop members ...." Ex. X at 11:53-58. Ethicon's "set the gap" argument is contrary to the patent's intrinsic record.

Ethicon also disregards the reality in which these devices operate by arguing that there can be no infringement because the REDACTED

Opp. at 8-10. The difference between the jaw gap in the Enseal X1 and the height of the black stop members is miniscule: REDACTED

*See, e.g.*, Exs. B at 00729-30; C at 83:3-22; 182:13-21; 187:19-22; D at 188:14-18. This small difference does not prevent the stop members from being configured to maintain a uniform jaw gap for effective tissue sealing and to prevent shorting. Durfee Decl., ¶¶ 9-11, 17-26. Indeed, REDACTED

*See, e.g.*,

5

Ex. C at 246:2-247:2; Ex. U. Ethicon's argument also disregards the forces exerted during surgery that can engage the stop members. *See* Durfee Decl., ¶¶ 17-26; Tyrrell Decl., ¶¶ 15-16; Declaration of Dr. Dean Mikami ("Mikami Decl."), ¶ 17. The Enseal X1 stop members are configured to maintain a uniform distance between the sealing surfaces.

### 2. The Enseal X1 Has a "Uniform" Jaw Gap

The Enseal X1 has non-conductive stop members that are configured to maintain a "uniform" gap under any reasonable interpretation of the claims. Ethicon's argument that "uniform" requires a jaw gap measurement that is exact to one thousandth of an inch along the entire length of the jaw is contrary to the intrinsic record, and ignores the reality of manufacturing these precision instruments. *See* Opp. at 10. For example, claim 9 of the '284 patent is directed to a configuration that requires each stop member to "protrude about 0.001 inches to about 0.005 inches from the inner facing surface of the jaw member." Ex. X at 14:40-43. This dependent claim confirms that the "uniform" gap of claim 1 must include stop members that can differ by at least 0.004 inches. *See Liebel-Flarsheim*, 358 F.3d at 909-10. This is consistent with the specification, which likewise describes a gap distance ranging from "about .001 inches to about .005 inches ...." Ex. X at 11:4-8. Ethicon's interpretation of "uniform" would improperly exclude these embodiments of the claimed invention. The proper construction of "uniform" in view of the discussion in the '284 patent is the "same within several thousandths of an inch." Durfee Decl., ¶¶ 12-16.

Here, REDACTED                                                        . Exs. C at 182:13-21; AA at 725. During his deposition, Mr. Trees confirmed that Ethicon REDACTED

REDACTED                                                     Ex. C at 189:17-190:5. The Enseal

X1 thus infringes even under Ethicon's interpretation of "uniform."[3]

Moreover, a person of ordinary skill would also understand that there are limits to the degree of precision that can be reproduced on a regular basis in manufacturing, and Ethicon's proposed definition of "uniform" ignores that reality. Durfee Decl., ¶¶ 15-16. Indeed, Ethicon's REDACTED                                                                                                . *See, e.g.,* Ex. C at 187:19-188:24; Ex. X at 11:4-6 (approximately .004 inch gap range described). Thus, even if the Enseal X1 jaw gap may vary by a few thousandths of an inch, it is still uniform.

Ethicon's criticism of Dr. Durfee's understanding that "uniform" can include a range of numbers, and its argument that the prosecution history of the parent of the '284 patent precludes such an interpretation, is incorrect and irrelevant. D.I. 67 at 19-21. First, Ethicon mischaracterizes Dr. Durfee's testimony. He did not testify that a range that differs up to five times along the length would be uniform in all circumstances, but rather, that a person of ordinary skill would understand that a range spanning thousandths of an inch (such as the .001 to .005 inches described in the patent) would be uniform in the context of the '284 patent. Ex. D at 188:14-189:6; Durfee Decl., ¶ 28.[4] Second, whatever the theoretical limits of the "uniform" limitation may be, the Enseal X1 undeniably falls well within those limits. Even setting aside Ethicon's REDACTED

---

[3] Mr. Leinsing's purported support for his interpretation is that the PTAB construed "uniform" to mean the "same." D.I. 67 at 21. But that only begs the question as to what same means in the context of the '284 patent because the patent makes clear that a range of gap distances are "uniform." Mr. Leinsing went on to criticize the PTAB's claim construction during his deposition even though the PTAB only construed this one phrase, so it's not entirely clear whether Mr. Leinsing agrees with the PTAB or not. Ex. E at 142:6-12.

[4] Ethicon's 400% argument confuses the difference between multiplying and calculating a percentage difference. Although increasing from .001 to .002 doubles the distance, that is a 100% difference, not a 200% difference.

7

REDACTED closely tracks the range described and claimed in the '284 patent. *See, e.g.,* Ex. X at 11:4-6; Durfee Decl., ¶ 27. The Enseal X1 has stop members that are configured to maintain a "uniform" gap under any reasonable interpretation of that term.

### C. The Distal Stop Member In the Enseal X1 Is Non-Conductive

The intrinsic record of the '284 Patent makes clear that the non-conductive stop members serve two functions: (1) allowing for a uniform gap between sealing surfaces; and (2) preventing short circuiting by not allowing the sealing surfaces to get too close so as to conduct current to one another. *See* Ex. X at 10:60-11:4, 11:26-27. One of ordinary skill would thus understand that stop members are non-conductive where they do not allow current to pass directly between the opposing sealing surfaces.[5] Durfee Decl., ¶¶ 29-31. Ethicon's argument that "non-conductive" in the claims means anything "comprised of a non-conductive material" ignores the very purpose of the stop members and their importance to the claimed invention. *Id.*; *see also* Ex. C at 174:18-176:16 (allowing current to run directly between surfaces would cause a malfunction). The proper construction to one of ordinary skill in view of the intrinsic record is a "stop member that does not allow current to pass directly between the seal surfaces." Durfee Decl., ¶¶ 29-31.

Here, REDACTED

Durfee Decl., ¶ 32; Ex. C at 174:18-175:17. As a result, the REDACTED

---

[5] Ethicon also argues that the distal pin was designed to be conductive to provide superior tissue sealing at the distal tip in comparison to LigaSure Impact. D.I. 63 at 7. Not only is the conductivity of the distal pin irrelevant to this determination (*see* Durfee Decl., ¶¶ 66-67), the tip burst pressure of both devices is well above the threshold required for effective sealing. *See* Ex. C at 68:22-69:7; Tyrrell Decl., ¶¶ 5-14.

REDACTED          Durfee Decl., ¶ 32; *see also*, Ex. C at 174:18-175:17. And even if the Court were to find that the distal stop member is conductive, Ethicon still infringes because the Enseal X1 has six other non-conductive stop members along the sealing surface. In short, adding the distal stop member to the device does not avoid infringement.

### D.     The Preamble in Claim 1 of the '284 Patent is not Limiting

Ethicon's assertion that using preamble terms throughout the specification makes the preamble limiting (Opp. at 14-15) overstates the law. The Federal Circuit has made clear that the preamble is only limiting where it is necessary to provide "life" to the claim, such as where the preamble was used to distinguish prior art during prosecution or where it is necessary to provide antecedent basis to the claim. *Symantec Corp. v. Computer Assocs. Int'l*, 522 F.3d 1279, 1288 (Fed. Cir. 2008) (citations omitted). Here, there is nothing in the body of the claims, the specification, or the prosecution history that supports the conclusion that the preamble is limiting. Indeed, Ethicon's own expert acknowledged there is nothing in the actual elements of claim 1 that is specific to an endoscopic instrument. Ex. E at 62:12-66:10.

Even if the Court determines that the preamble is limiting, the Enseal X1 still infringes. Here, the shaft of the Enseal X1 clearly fits within a trocar used in endoscopic procedures. *See*, D.I. 41 at 12. Ethicon's argument that the device is only indicated for open procedures ignores that claim 1 is an apparatus claim, not a method claim requiring a particular use. *See Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-10 (Fed. Cir. 2002). Ethicon's argument is also contrary to the testimony from its own surgeon declarant, Dr. Frye, who testified REDACTED

Ex. T at 54:7-55:4; 56:13-19.

9

### E. Ethicon's Other Noninfringement Arguments are Meritless

Ethicon's remaining arguments seek to inject non-existent limitations into the claim. Specifically, Ethicon's argument that "disposed along the length of at least one of the seal surfaces" requires a stop member at the proximal *edge* of the sealing surface is contrary to the claim language. Ethicon also misstates the prosecution history, where the patentee distinguished prior art that only had stop members on the distal *portion* of the surface. D.I. 67 at 29-30; Ex. F at 13. The patentee never argued there must be a stop member at the proximal *edge* of the sealing surface. *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) (disclaimer requires clear and unambiguous disavowal of claim scope). The plain and ordinary meaning of the claim only requires stop members "disposed from a proximal portion to a distal portion of one of the seal surfaces." Durfee Decl., ¶¶ 33-39. Here, REDACTED

D.I. 63, Ex. 3 at 4.

Ethicon's argument that the stop members are not "disposed along the same plane on the seal surface" because the height of the stop members are not the same fails for at least two reasons. *See* Opp. at 13-14. First, the plain language of the claim refers to the "same plane *on the seal surface,*" which makes clear that the plane is defined by the seal surface, not the top of the stop members. Durfee Decl., ¶ 41. Second, Ethicon ignores that several dependent claims are directed to stop members of varying heights. See Ex. X at 14:7-11 (claim 2), 14:40-47 (claims 8-9). Claim 1 thus also includes stop members of varying heights that are "disposed along the same plane on the seal surface." *See Tr. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1369-71 (Fed. Cir. 2016). The proper construction of the term is "intersecting the plane formed by the seal surface," and the Enseal X1 practices this limitation. Durfee Decl., ¶¶ 40-45.

## IV. ETHICON'S INFRINGEMENT IS IRREPARABLY HARMING COVIDIEN

### A. Ethicon Is Using The Enseal X1 To Take Covidien Market Share In The Advanced Bipolar And Other Markets

Loss of customers and market share are types of harm that warrant injunctive relief. *See Trebro Mfg., Inc. v. Firefly Equip., LLC,* 748 F.3d 1159, 1170 (Fed. Cir. 2014). Here, Ethicon is using the Enseal X1 to take market share from Covidien. *See, e.g.,* Exs. L at 40398 REDACTED

; K at 210:6-211:11. REDACTED

*See* Exs. G; H; I; Declaration of Kris Gaston ("Gaston Decl.") ¶ 18. REDACTED

Exs. J; K at 252:20-253:21; 291:25-296:1; Declaration of Keith Ugone ("Ugone Decl."), ¶¶ 4, 29, 34. And Covidien has already lost significant customer accounts due to Enseal X1. Supplemental Declaration of John Chindlund ("Chindlund Decl."), ¶¶ 7-24. REDACTED

Exs. K at 210:6-211:11; L at 40401. In actuality, REDACTED Ex. C at 135:25-136:7.

Covidien's lost accounts due to Enseal X1 affect far more than its sales of the LigaSure Impact device. Ugone Decl., ¶¶ 41-44. The Enseal X1 has also caused Covidien to lose substantial sales of other products by providing Ethicon with a credible advanced bipolar product to convince hospitals to make a broader move to Ethicon products. Chindlund Decl., ¶ 24. REDACTED

Ex. L at 398 REDACTED

11

REDACTED

Ethicon's claim that lost market share cannot support an injunction because the damages are quantifiable disregards the complexity of customer relationships in this market. Opp. at 22-23. The harm that Covidien has already suffered (and will continue to suffer) from the Enseal X1 extends well beyond advanced bipolar devices, and can have long-term consequences that are nearly impossible to quantify due to the complexity of customer contracts and the impact of sole-source conversions. Chindlund Decl., ¶¶ 5-6, 9, 18; Ugone Decl., ¶¶ 34, 56-59; Ex. K at 221:9-222:16; 232:21-233:16; 237:23-239:11; 254:4-257:14; 258:5-259:22; Ex. M. REDACTED

Ex. K at 221:9-222:25; 258:5-259:22. In short, the harm to Covidien cannot be completely fixed with money damages.

### B. Ethicon's Conduct Is Likely To Harm Covidien In Other Ways

There is also a substantial risk that Covidien will suffer price erosion as a result of Ethicon's Enseal X1 pricing strategy. *Sanofi-Synthelabo v. Apotex*, Inc., 470 F.3d 1368, 1381-83 (Fed. Cir. 2007) (price erosion supports injunctive relief). REDACTED

Ex. BB. REDACTED

and creates significant pricing pressure on Covidien. Chindlund Decl., ¶¶ 2-4, 14, 18; Ugone Decl., ¶¶ 45-49. Ethicon does not dispute that, but rather notes that other factors also exert pricing pressure. Opp. at 23-24. Ethicon's argument misses the point. REDACTED

Ugone Decl.,

¶¶ 45-49. Ethicon also ignores that price erosion is likely to cause long-term, irreparable harm because it is unlikely that Covidien would be able to recover any price adjustments even if the Enseal X1 were later removed from the market after a trial on the merits. *Id.*, ¶ 48.

Ethicon also concludes that Covidien has not yet experienced any reputational harm, but Ethicon markets its product in a manner that denigrates the LigaSure device. Ethicon promotes the Enseal X1 as a device that "seals better" than LigaSure Impact, and has used aggressive marketing that makes clear Ethicon's goal is to damage Covidien and its market share. Ex. G; D.I. 40 ¶ 35. REDACTED

Opp. at 23. These types of statements are likely to harm Covidien's reputation as the market leader in the advanced bipolar space. Ugone Decl., ¶¶ 30, 34; Chindlund Decl., ¶ 25; *see* Exs. P at 64:2-64:20 and O at 75:18-23 REDACTED

The extent of harm to Covidien's reputation is impossible to quantify, and further supports an injunction.

## V. THERE IS A NEXUS BETWEEN ETHICON'S INFRINGEMENT AND THE HARM TO COVIDIEN

There is a nexus between Ethicon's infringement and harm to Covidien. *See Veracode, Inc. v. Auth., Inc.*, 137 F.Supp.3d 17, 91 (D. Mass. 2015). It is undisputed that sealing performance is a critically important feature for advanced bipolar devices. Exs. C at 178:4-11; K at 162:14-16; N at 148:7-16; O at 99:4-8; P at 82:9-13; Ugone Decl., ¶¶ 20-21. REDACTED

Ex. C at 62:3-8. The stop members of the '284 patent are critical to regulating the first parameter, jaw gap distance. Ex. X, Abstract, 1:23-26; D.I. 41, ¶¶ 45-48, 55-57; Durfee Decl., ¶¶ 17-26.

Ethicon's arguments regarding why no nexus exists both fail. First, REDACTED

13

REDACTED

        Opp. at 24-26. REDACTED

Exs. O at 99:4-12; P at 82:9-13. REDACTED

Exs. C at 112:19-22; K at 174:3-7; V at 18658; W at 46, 63; *see also* Ugone Decl., ¶¶ 21, 25. Without the reliable sealing enabled by the '284 patent, there would be no consumer demand, just as there wasn't with the Enseal G2 device. Ex. C at 52:8-17.

Second, Ethicon's argument that there is no nexus because neither party's marketing materials specifically promote stop members (Opp. at 26) disregards the fact that the *benefit* achieved by the '284 patent—effective tissue sealing—is consistently promoted by both parties. Ugone Decl., ¶ 31. For this reason, Ethicon's reliance on *Marine Travelife*, where the patentee "never even mentioned, much less touted, its invention's supposedly important benefits" is inapposite. *Marine Travelift, Inc. v. ASCOM SpA*, No. 14-443, 2014 WL 4215925, at *15 (E.D. Wisc. Aug. 25, 2014). Here, both parties tout the benefits of the '284 patent—effective tissue sealing—in their product literature. *See, e.g.*, D.I. 40, Exs. 5-6; Ex. Y; Ugone Decl., ¶¶ 20-21, 25, 32.

## VI. NEITHER THE BALANCE OF HARMS NOR THE PUBLIC INTEREST JUSTIFY ALLOWING ETHICON'S INFRINGEMENT TO CONTINUE

The balance of the equities favors an injunction because the purported harm Ethicon cites all results from its decision to market an infringing product. *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986). This is not a case where a party inadvertently designs a product that infringes a patent of which they were not aware. REDACTED

REDACTED

Indeed, that is why Ethicon filed *inter partes* review petitions attacking the '284 patent. Exs. Q; R; *see also* Ex. C 146:25-147:25. After those petitions were denied, Ethicon could have simply removed the stop members or used another design feature to accomplish the same goal, such as the teeth used in its G2 device. Ex. C at 82:16-24, 92:20-94:2. REDACTED

. *Id.* REDACTED


*Id.* at 266:16-20. The Court should not indulge any claims of harm resulting from Ethicon's calculated risk to bring the Enseal X1 to market as quickly as possible. Ugone Decl., ¶¶ 24-25.

Finally, Ethicon argues the public interest supports denying an injunction because the device is "highly valued by the surgeons who are using it." Opp. at 29. But the preferences of a handful of surgeons do not justify allowing an infringing product to remain on the market. REDACTED


Exs. O at 25:24-28:2; P at 87:16-88:2; S at 89:14-17.

REDACTED


Mikami Decl., ¶¶ 15-16; Gaston Decl., ¶¶ 19-20; Ugone Decl., ¶ 67.

### VII. CONCLUSION

For the foregoing reasons, Covidien requests that the Court enter a preliminary injunction preventing Ethicon from making, selling and marketing the infringing Enseal X1 device.

Dated: August 14, 2017					Respectfully submitted,

									*/s/ David J. Apfel*
									David J. Apfel (BBO No. 551139)
									Samuel E. Sherry (BBO No. 667527)
									**GOODWIN PROCTER LLP**
									100 Northern Avenue
									Boston, MA 02210
									Tel. 617.570.1000
									Fax:  617.227.8591
									dapfel@goodwinlaw.com
									ssherry@goodwinlaw.com

									Of Counsel (admitted pro hac vice):

									Drew M. Wintringham, III
									drew.wintringham@dlapiper.com
									Matthew Ganas
									matt.ganas@dlapiper.com
									DLA PIPER LLP (US)
									1251 Avenue of the Americas
									New York, New York 10020-1104
									Tel: 212.335.4500
									Fax: 212.335.4501

									Richard T. Mulloy
									richard.mulloy@dlapiper.com
									DLA PIPER LLP (US)
									401 B Street, Suite 1700
									San Diego, CA 92101-4297
									Tel: 619.699.2700
									Fax: 619.699.2701

									*Attorneys for Defendants and Counterclaim-Plaintiffs Covidien AG, Covidien LP, and Covidien Sales LLC*

## **CERTIFICATE OF SERVICE**

I, David J. Apfel, certify that this document filed through the ECF system will be served on August 14, 2017 electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and by first-class mail, postage prepaid on those identified as non-registered participants.

					*/s/ David J. Apfel*
					David J. Apfel