UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ETHICON ENDO-SURGERY, INC., et al., | ) ) ) | |
| Plaintiffs and Counterclaim-Defendants, | ) ) | |
| v. | ) ) | Civil No. 16-12556-LTS |
| COVIDIEN LP, et al., | ) ) ) | |
| Defendants and Counterclaim-Plaintiffs. | ) ) | |

MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

June 21, 2018

SOROKIN, J.

In this intellectual property dispute, Ethicon Endo-Surgery, Inc. and Ethicon Endo-Surgery, LLC (collectively, "Ethicon"), seek a declaratory judgment that one of their products does not infringe patents held by Covidien LP, Covidien Sales LLC, and Covidien AG (collectively, "Covidien"). Covidien has counter-sued, alleging infringement of a total of four of its patents: United States Patent Numbers 6,585,735 ("the '735 patent"), 8,241,284 ("the '284 patent"), 8,323,310 ("the '310 patent"), and 9,241,759 ("the '759 patent").[1] In response, Ethicon has asserted invalidity and non-infringement as to each patent. This Court denied Covidien's request for a preliminary injunction. Pending now are the parties' briefs on claim construction. The Court has reviewed all relevant submissions and held a hearing on May 31, 2018, pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), at which it heard oral argument and technology tutorials.

---

[1] Other patents have been the subject of claims and counterclaims in this action, but the parties have agreed to withdraw or dismiss such claims.

I.  BACKGROUND

The parties dispute the proper construction of ten terms appearing in claims disclosed in three of the patents in suit.[2] Each patent generally relates to features of advanced bipolar surgical instruments used to seal and cut tissue or blood vessels. Both Ethicon and Covidien produce and sell such instruments. The devices permit surgeons to grasp a vessel or tissue between two jaws at one end of the instrument, apply energy to the vessel or tissue to form a seal and stop the blood flow through it, then cut the sealed tissue using a knife that moves along the length of the jaws.

The '284 patent, entitled "Vessel Sealer and Divider with Non-Conductive Stop Members," Doc. No. 121-2,[3] focuses on features of advanced bipolar surgical instruments which Covidien says are aimed at "providing more consistent sealing of blood vessels" by controlling "the gap distance" between the opposing jaws. Doc. No. 118 at 7. Claim 1 of the '284 patent discloses, in relevant part:

> An endoscopic bipolar forceps, comprising: an elongated shaft having opposing jaw members at a distal end thereof, . . . each including respective flat seal surfaces extending along a respective length thereof . . . ; a plurality of *non-conductive stop members disposed along the length of at least one of the seal surfaces* of at least one of the jaw members such that the plurality of non-conductive stop members are *disposed along the same plane on the seal surface* with respect to one another, the non-conductive stop members configured to maintain *a uniform distance between the jaw members* along the length thereof; and a knife . . . .

Doc. No. 121-2 at 23 (emphasis added).

The figure below depicts the "distal end" of the device, where the jaws (labeled 20 and 22) are located, and includes "a series of stop members [labeled 50a and 50g] disposed along an

---

[2] The parties have not identified any claim terms from the '735 patent requiring construction.
[3] Citations to "Doc. No. ___" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

2

inner facing surface of a jaw member." Id. at 13, 19. There are six disputed terms from the '284 patent, each of which relates in some way to the stop members or the jaws.



The '310 patent, entitled "Vessel Sealing Jaw with Offset Sealing Surface," Doc. No. 121-3, focuses on what Covidien describes as "the other critical mechanical parameter that affects proper vessel sealing—the pressure applied to the tissue," Doc. No. 118 at 21. The parties dispute the construction of only one term from this patent, and, for reasons explained below, no further description of its claims or language is necessary at this time.

The '759 patent, entitled "Vessel Sealer and Divider for Use with Small Trocars and Cannulas," Doc. No. 121-5, focuses on what Covidien calls the "mechanical systems used . . . to actuate the jaw members and facilitate grasping and manipulating tissue and vessels," Doc. No. 118 at 30. Claim 1 of the '759 patent discloses, in relevant part:

> An endoscopic bipolar forceps, comprising: a housing; a shaft . . . ; a drive sleeve . . . operably coupled to the movable jaw member . . . ; a movable handle *of unitary construction* having a *finger loop* positioned towards a first end thereof, *a drive flange* positioned towards a second end thereof, and a locking flange disposed between the *finger loop* and *the drive flange*, *the drive flange operably coupled to the drive sleeve* towards the proximal end of the drive sleeve such that movement of the movable handle from an open position to a closed position moves the movable jaw member relative to the fixed jaw member from the first position to the second position; a selectively advanceable knife . . . ; and a selectively actuatable finger actuator . . . .

Doc. No. 121-5 at 39 (emphasis added).

The figure below depicts the movable handle (labeled 40), among other parts contained in a device's housing, "separated" or in an "exploded view." Id. at 12, 30, 36. The major components of the movable handle are the finger loop (labeled 41), the drive flange (labeled 47a and 47b), and the locking flange (labeled 44). Id. at 12, 31, 34. There are three disputed terms from the '759 patent, each of which relates in some way to the components of the movable handle.



## II. LEGAL STANDARD

The "construction of a patent, including terms of art within its claim, is exclusively within the province of the court." Markman, 517 U.S. at 372. "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quotation marks omitted). The claim itself is "of primary importance, in the effort to ascertain precisely what it is that is patented." Merrill v. Yeomans, 94 U.S. 568, 570 (1876); accord Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 339 (1961); Phillips, 415 F.3d at 1312.

"[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13 (quotation marks omitted). Sometimes "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314. Other times, though, when "the meaning of a claim term as understood by persons of skill in the art is . . . not immediately apparent," or when "patentees . . . use terms idiosyncratically," a court must consider "those sources available to the public" which shed light on how "a person of skill in the art would have understood [the] disputed claim language." Id. (quotation marks omitted).

A "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313. Indeed, intrinsic evidence—the language appearing in the claims and elsewhere in the patent itself, as well as any available prosecution

5

history of the patent—is the most reliable and useful evidence in determining the meaning of a patent's claims. Id. at 1317-19.

Extrinsic evidence, including expert and inventor testimony, dictionaries, and treatises, may aid in understanding the underlying technology, how the invention works, and whether "a particular term . . . has a particular meaning in the pertinent field." Id.; accord Markman v. Westview Instruments, Inc., 52 F.2d 967, 980 (Fed. Cir. 1995). Although a court may consider extrinsic evidence to the extent it is useful, it may not rely on such evidence to "change the meaning of claims in derogation of the" intrinsic evidence of record. Phillips, 415 F.3d at 1319.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2124 (2014). The burden is on the party challenging a patent to demonstrate indefiniteness by clear and convincing evidence. See Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 95 (2011). "Indefiniteness . . . is a question of law"; it "is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1319 (Fed. Cir. 2008). In some circumstances, courts decline to resolve questions of indefiniteness at the claim construction stage of litigation, deferring them until summary judgment when a fuller record is available. E.g., Indus. Tech. Research Inst. v. LG Elecs. Inc., No. 13-2016, 2014 WL 6907449, at *3 (S.D. Cal. Dec. 8, 2014); Int'l Dev. LLC v. Richmond, No. 09-2495, 2010 WL 4703779, at *6-7 (D.N.J. Nov. 12, 2010).

III.   DISCUSSION

Guided by these principles—and having carefully reviewed the language of each relevant patent in its entirety, any cited prosecution history, and all other extrinsic evidence proffered by both parties—the Court will address each of the ten disputed terms in turn.

   A.   "Stop member(s)" ('284 patent, claims 1, 2, 4, 7, 9, 10, 12, and 14)

Eight claims in the '284 patent refer to "*stop members*" (or, in the case of one claim, "at least one . . . stop member") as a component of the disclosed surgical device. The claim excerpted in the Background section above provides an example. Ethicon proposes construing the term in its plural form—the manner in which it appears throughout all but one of the relevant claims, including both independent claims—as "structures sized to act as a physical stop between the jaw members when the jaw members are in the closed position." Doc. No. 140-1 at 1. Covidien proposes construing the term in its singular form, as "a structure that, if engaged with an opposing jaw member during sealing, yields a desired gap distance." Id. Covidien "does not object to construing the plural form," so long as "Ethicon agrees that the claim requires only two or more stop members." Doc. No. 126 at 5 n.1. Each party relies primarily on the patent claims and specification to support its proposal. Id. Neither has offered evidence pertinent to construing this term beyond that which was available when the Court preliminarily addressed the meaning of the term last fall in its order denying a preliminary injunction.

The Court adopts Ethicon's proposed construction.[4] Ethicon's proposal is consistent with the intrinsic record and with the Court's discussion of the term in its previous Order, and it

---

[4] The parties agree, and the Court finds, that both independent claims in the '284 patent describe a "plurality" of "stop members" and, thus, require two or more stop members. To the extent a construction of the singular term "stop member" is necessary, it can easily be derived from the plural construction.

7

accounts for the primary purpose of the invention, i.e., maintaining a desirable and consistent gap distance. It does not conflict with the dependent claim which contemplates "stop members" of different heights, as Covidien implies, as this construction in no way precludes the possibility that a device might contain "stop members" having different sizes or shapes. Covidien's proposal, on the other hand, unnecessarily injects ambiguity into an otherwise clear term, particularly via the phrase "if engaged with an opposing jaw member during sealing."[5]

Accordingly, the Court construes "stop members" to mean "structures sized to act as a physical stop between the jaw members when the jaw members are in the closed position."

B. "Non-conductive" ('284 patent, claims 1, 2, 4, 7, 9, 10, 12, and 14)

The same eight claims which refer to "stop members" uniformly describe them as "*non-conductive*." Ethicon proposes construing the italicized term to mean "stop members that are not capable of conducting electricity." Doc. No. 140-1 at 1. Covidien proposes "stop member[s] that do[] not allow current to pass directly between the seal surfaces."[6] Id.

Ethicon suggests that the plain and ordinary meaning of "non-conductive" is not reasonably subject to dispute, particularly where that meaning is overwhelmingly supported by both the patent's specification and extrinsic evidence including dictionary definitions, treatises, and expert testimony. Doc. No. 121 at 14-15; Doc. No. 125 at 6-7. According to Covidien, the term should be construed in a manner which "reflects a key concern and benefit of stop members identified in the '284 patent—avoiding short-circuiting by preventing current from passing

---

[5] By narrowing the focus to the moment of sealing only, Covidien appears to ignore its own urging that "a doorstop is still a doorstop" even when the door is not open far enough to touch it. Doc. No. 126 at 4. The Court agrees with that principle, which here suggests that "stop members" remain "stop members" whether the device is engaged in sealing or not.
[6] The Court has modified Covidien's proposal to reflect its construction of the plural "stop members" above.

8

directly between the seal surfaces during sealing." Doc. No. 118 at 10. Covidien observes that the specification prefers, but does not require, that stop members be made of insulative materials, and also urges that the patent should be read to include embodiments where "stop members" are composed of conductive material (such as a metal) coated with insulative material. Id. at 11-12.

The Court construes "non-conductive [stop members]" to mean "stop members that are not capable of conducting an amount of electricity significant to the operation of the device." In adopting this construction, the Court has modified Ethicon's proposal to account for the fact, expressed here in extrinsic sources such as expert testimony, that even insulative materials are technically capable of conducting some amount of electricity (albeit an amount insignificant in the context of the disclosed invention). Doc. No. 137-2 at 16-20. This construction is dictated by the plain and ordinary meaning of "non-conductive," which is a commonly understood term.[7] Phillips, 415 F.3d at 1314. Covidien has not demonstrated that anything about the '284 patent or its purpose justifies construing this relatively simple term in a manner which eschews its plain meaning in favor of a definition seemingly contrived to sweep within the universe of "non-conductive stop members" a component made entirely of steel.[8] Cf. Doc. No. 99 at 7-8 (noting steel can, and in the relevant product does, conduct electricity, such that "a reasonable person of ordinary skill in the art" would not consider it "non-conductive").

---

[7] Although the plain meaning adopted by the Court is supported by the intrinsic evidence (e.g., the specification's inclusion of a substantial list of examples of insulative materials from which stop members might be created) and the extrinsic evidence (e.g., the dictionary definitions offered by Ethicon and reviewed by this Court), the Court concludes the limitation expressed in its construction is created by the claim language itself.

[8] To the extent Covidien argues that Ethicon's proposed construction, or the Court's variation thereon, fails to account for a stated purpose of the invention (i.e., to prevent short-circuiting during use of the device), its own expert has testified to the contrary. Doc. No. 137-2 at 14. To the extent it is possible that a purported stop member might be comprised of two materials—a metal coated by an insulator—the Court need not resolve now whether such a configuration would be within its adopted construction of "non-conductive."

C. "A uniform distance between the jaw members" ('284 patent, claims 1 and 12)

The two independent claims in the '284 patent describe the stop members as "configured to maintain *a uniform distance between the jaw members* along the length thereof." The parties dispute the proper construction of the italicized phrase, with their disagreement centering on the meaning of the word "uniform." Ethicon urges that the term means "a distance between the jaw members that is the same," while Covidien proposes "a distance between the jaw members that is the same (i.e., within several thousandths of an inch) when tissue is held therebetween." Doc. No. 140-1 at 2.

The Court construes "a uniform distance between the jaw members" to mean "a distance between the jaw members that is the same when the jaw members are in the closed position." In adopting this construction, the Court has modified Ethicon's proposal to account for the fact, stressed by Covidien and conceded by Ethicon, that the size and uniformity of the gap distance between jaw members is critical in the context of the '284 patent when the device is being used to grasp, seal, and cut tissue (all of which occur when the jaw members are closed). See Doc. No. 118 at 19; see also Doc. No. 120-8 at 9 (reflecting PTAB construed the term as meaning "when tissue is held between the opposing jaw members . . . the distance between the jaw members is the same"); cf. note 6, supra.

In defining "uniform" to mean "the same," the Court does not intend, as a matter of law and regardless of context, to require precision of one-thousandth of an inch or less, or to preclude the possibility that measurements within "several thousandths of an inch" might reasonably be considered "the same" in certain circumstances. See Doc. No. 99 at 10 n.6 (acknowledging reality that "manufacturing tolerances permit ranges of acceptable measurements," sometimes "comparable to the width of one or a few human hairs"). Similarly, the Court does not find that

the prosecution history cited by Ethicon—in which Covidien stated "a 400% difference in distance" could not reasonably be viewed as "substantially uniform," Doc. No. 121-15 at 16—provides a clear and unmistakable disavowal applicable to all measurements in every setting. Context matters. It will remain for the factfinder to resolve, for purposes of the '284 patent and in the context of the precision instruments at issue in this case, how much variation can exist while still maintaining uniformity.

    D.    <u>"Disposed along the length of at least one of the seal surfaces" ('284 patent, claims 1 and 12)</u>

Both independent claims in the '284 patent also describe the stop members as "*disposed along the length of at least one of the seal surfaces* of at least one of the jaw members." In their written submissions, the parties dispute the meaning of the italicized phrase. Ethicon proposes construing the phrase to mean "disposed along the length of at least one of the seal surfaces from the distal end to the proximal end." Doc. No. 140-1 at 3. Covidien proposes "disposed from a proximal portion to a distal portion of one of the seal surfaces." Id.

The Court adopts Ethicon's proposal. With its use of the word "portion," Covidien offers a vague construction that does not capture the plain and ordinary meaning of the claim language. At the <u>Markman</u> hearing, Covidien explained that its only objection to Ethicon's proposal was the possibility that "from . . . end to . . . end" might be read to mean "from . . . tip to . . . tip." Ethicon explicitly disavowed such a narrow construction at the hearing, and the Court does not interpret "end" to mean "tip." With this clarification, Covidien assents to Ethicon's proposal, all available intrinsic and extrinsic evidence supports it, and the Court endorses it.

    E.    <u>"Are disposed along the same plane on the seal surface" ('284 patent, claims 1 and 12)</u>

Both of the '284 patent's independent claims further specify that the stop members "*are disposed along the same plane on the seal surface* with respect to one another." The parties

disagree about the meaning of the italicized language. Ethicon asserts it is indefinite, offering at least three alternative constructions it says could be applied and identifying one of those—"extend the same height from the seal surface when the jaw members are in the closed position"—which it suggests is most reasonable in the event its indefiniteness argument fails. Doc. No. 121 at 18-23; Doc. No. 140-1 at 4. Covidien believes the term is susceptible to construction and urges it means "intersect the plane formed by the seal surface." Doc. No. 118 at 14-16; Doc. No. 140-1 at 4.

The Court construes "are disposed along the same plane on the seal surface" to mean "start at or intersect with the plane formed by the seal surface." Ethicon has not offered clear and convincing evidence proving indefiniteness. The plain and ordinary meaning of the claim language makes clear that the relevant plane is created by the seal surface itself, and is not a plane created by the tops of the stop members (above the seal surface), or by the bottoms of stop members (assuming some or all originate below the seal surface and emerge through it). Thus, two of the three potential meanings Ethicon has identified disregard the claim language. The third potential meaning, "start at the same point on the seal surface," is consistent with Covidien's view of this term and is accounted for in the Court's construction. The Court has modified Covidien's proposal to explicitly encompass stop members which emerge through <u>or</u> begin at the seal surface, in light of positions taken by both parties at the <u>Markman</u> hearing.[9]

F. <u>"The jaw members movable with respect to the elongated shaft" ('284 patent, claim 12)</u>

The sixth and final disputed term from the '284 patent appears only in claim 12, which describes "opposing jaw members" at the distal end of the device's "elongated shaft," "*the jaw*

---

[9] Covidien expressed that "intersect" alone might not be sufficient to capture both scenarios, but that it intended its construction to do so, while Ethicon stated it would view stop members beginning on the seal surface as "intersecting" the plane created by that surface.

*members movable with respect to the elongated shaft.*" According to Ethicon, the italicized phrase means "each of the jaw members movable with respect to the elongated shaft," while Covidien proposes "the pair of jaw members movable relative to the shaft." The subtle difference in the competing proposals turns on whether the language requires movement by one or both jaw members.[10]

The Court adopts Ethicon's proposal. The claim term uses language which has an ordinary meaning and is understandable "even to lay judges." Phillips, 415 F.3d at 1314. The plain meaning—where "jaw members," plural, are described as "movable"—is that both jaw members (not "only one" or "at least one") can be moved. The intrinsic record, which invokes phrases like "at least one" elsewhere within the same claim, supports such a construction. Covidien has offered no expert opinion or other evidence suggesting that a person of skill in the art would understand the language used in this term in some other manner which "is not readily apparent." Id. As such, the plain and ordinary meaning controls.

G. "A plane is formed between the opposing sealing surfaces" ('310 patent, claims 1 and 16)

The '310 patent contains two claims which require that, when a device's jaw members are in the closed position, "*a plane is formed between the opposing sealing surfaces.*" Because a gap exists between the opposing jaw members when they are closed, and because basic geometry dictates that an unlimited number of planes exist within such a three-dimensional space, Ethicon argues that the italicized language is indefinite. Doc. No. 121 at 28-29; Doc. No. 140-1 at 7. Covidien disagrees and proposes construing the term to mean "an imaginary flat surface

---

[10] Although the Court understands Covidien seeks a construction which allows for only one movable jaw, it is not clear to the Court that Covidien's proposed language ("the pair . . . movable") encompasses such a scenario. Neither the claim itself nor Covidien's proposal contain language which plainly and unambiguously includes a device with one movable jaw member (i.e., language like "at least one jaw member movable . . .").

13

bisecting the opposing sealing surfaces when grasping tissue." Doc. No. 118 at 22-25; Doc. No. 140-1 at 7.

As to this term, Ethicon raises substantial questions of indefiniteness. Given the burden on Ethicon to establish indefiniteness by clear and convincing evidence, as well as the potentially dispositive and patent-invalidating effect of an indefiniteness finding, it is appropriate to defer resolution of this question until the close of all discovery, when a fuller record is available.[11]

H.   "Of unitary construction" ('759 patent, claim 1)

Claim 1 of the '759 patent describes a surgical device with "a movable handle *of unitary construction*." Ethicon proposes construing the italicized language to mean that the movable handle is "constructed as a single, indivisible component." Doc. No. 140-1 at 8-9. Covidien proposes a broader meaning, "constructed as a single unit," id. at 8, which would include movable handles where the necessary components (finger loop, drive flange, and locking flange) are separate pieces attached together to form a single unit.

The Court adopts Covidien's proposal, as it is consistent with the plain and ordinary meaning of the claim language. The intrinsic record does not support a construction as narrow as Ethicon suggests. Nothing in the patent limits the scope of the claim to devices with indivisible movable handles. The specification and figures contemplate embodiments where the movable handle includes separable components, such as a "gripping element." Doc. No. 118 at 34-35 (discussing and reproducing relevant figure). Moreover, the prosecution history supports a construction which excludes configurations in which the finger loop, drive flange, and locking flange are separate components only "movably coupled" (not directly connected), but not one

---

[11] In cases where a jury trial is anticipated, indefiniteness determinations often are deferred until summary judgment. Here, should the parties elect to forego summary judgment, the issue will be deferred until the bench trial.

which goes so far as to require indivisibility. Doc. No. 120-17 at 9-10; see Doc. No. 118 at 35-36 (summarizing relevant statements distinguishing prior art).

As such, the Court construes "of unitary construction" to mean "constructed as a single unit."

I. "A drive flange"/"a drive flange operably coupled to the drive sleeve" ('759 patent, claim 1)

The device disclosed in claim 1 of the '759 patent has, as one component of the "movable handle," "*a drive flange*" which is "*operably coupled to the drive sleeve.*" The parties dispute the proper construction of both italicized phrases. Ethicon proposes construing "a drive flange" to mean "a force-actuating and projecting rib or rim." Doc. No. 140-1 at 9. Covidien favors a broader construction, "a force-actuating protrusion." Id.

The Court adopts Ethicon's proposal. The parties have cited a number of dictionary definitions for "flange," nearly all of which demonstrate that Ethicon's construction best expresses the plain and ordinary meaning of the term. The intrinsic evidence supports Ethicon's construction as well. The phrase "projecting rib or rim" appears to aptly describe all of the other components which the '759 patent also calls "flanges." E.g., Doc. No. 121-5 at 12-13, 31-32, 34, 36 (depicting and describing upper flanges [45a and 45b], a flange [90] at the lower end of the movable handle, a pivot flange [118] on a jaw member, a locking flange [44], and a flange [154] on the drive ring). Moreover, the specification describes at least one component of the device as a "protrusion"—not a "flange"—apparently distinguishing between the terms. Id. at 8-10, 20, 23, 32 (depicting and describing a protrusion [117] on the pivoting jaw member). The sole support for Covidien's proposal is the opinion of its expert, whose testimony suggests he selected the term because he could not "think of any flanges that are named [in the '759 patent] that would not be protrusions." Doc. No. 137-2 at 224. None of the dictionary definitions of

15

"flange" cited by the parties contain the word "protrusion," and the specification's apparent distinction between a protrusion and a flange undermines Covidien's position with respect to this term.

Ethicon proposes construing the related term "operably coupled to the drive sleeve" to mean "abutting a drive assembly for imparting reciprocating movement to the drive sleeve." Doc. No. 140-1 at 9. Covidien proposes "linked to the drive sleeve for imparting movement thereto." Id. The disagreement here centers on two questions: 1) whether that component must "abut[] a drive assembly" or simply be "linked to the drive sleeve"; and 2) whether the movement imparted by the drive flange is necessarily "reciprocating."

The Court incorporates elements from both parties' proposals and construes the term as follows: "linked to the drive sleeve for imparting reciprocating movement thereto." While the specification expressly contemplates embodiments which include a "drive assembly," and which involve the drive flange physically contacting the "drive assembly," the claim itself requires neither a drive assembly nor direct physical contact between the drive flange and any particular component.[12] Furthermore, the phrase "operably coupled," which appears two other times in claim 1, plainly and ordinarily (and specifically in the context of the '759 patent) encompasses components which are either directly <u>or indirectly</u> linked to one another.[13] In requiring the drive flange to "abut" the "drive assembly," Ethicon's proposal improperly takes one embodiment described in the specification and reads it into the claim language.

---

[12] As Ethicon's expert has conceded, the specification lists components which might be included in a "drive assembly," but a number of those are not required by claim 1. Doc. No. 136-1 at 25-33. This introduces uncertainty into the scope of Ethicon's proposal.

[13] Claim 1 describes the drive sleeve as "operably coupled to the movable jaw member," and the finger actuator as "operably coupled to the selectively advanceable knife." Doc. No. 121-5 at 39.

As to the sort of movement imparted, however, there appears to be no meaningful dispute. Both parties agree that operation of the drive flange imparts reciprocating movement to the drive sleeve. In fact, the specification is replete with instances in which the terms "drive sleeve" and "reciprocating sleeve" are used interchangeably. Nothing in the record suggests any other sort of movement by the drive sleeve is contemplated or possible in the context of the '759 patent.

J. "Finger loop" ('759 patent, claim 1)

The first claim of the '759 patent also refers to the "movable handle . . . having a *finger loop*." Ethicon proposes construing "finger loop" to mean "a closed, finger-receiving structure that is generally round or oval shaped." Doc. No. 140-1 at 10. Covidien urges a broader construction, "a closed or partially open curve for receiving a finger(s)." Id. The parties' disagreement centers on two questions: 1) whether a "loop" must be closed; and 2) whether a "loop" must be "round or oval" in shape.

The Court will construe "finger loop" to mean "a closed curve for receiving one or more fingers." Neither party has offered evidence suggesting the word "loop" would have a specialized meaning in the mind of one skilled in the art, distinct from the ordinary meaning a layperson would understand upon hearing the term. Although Covidien has pointed to a dictionary definition which reaches both closed and open curves, the Court finds that is not the meaning which most commonly is invoked in conventional use of the term. Rather, the plain and ordinary meaning of "loop" contemplates a structure which doubles on itself or ends where it began—i.e., a closed curve of some sort. See, e.g., *Loop*, 9 The Oxford English Dictionary 11-13 (2d ed. 1989) (including definitions contemplating portions of string "doubled, commonly fastened at the ends," the shapes formed where lines cross at the tops of cursive lowercase letters

17

such as "b" and "h," completed circuits or paths for current, a "curve crossing itself" in skating, and a "length of film . . . whose ends have been joined").

This meaning is supported here by the '759 patent read as a whole. It contains fourteen drawings depicting the finger loop, each of which shows a closed curve. In addition, it describes components with open-curved shapes using other terms, not as "loops." E.g., Doc. No. 121-5 at 33, 35 (describing "C-shaped," "U-shaped," and "scoop-like" structures). Further, the specification describes the finger loop as having an "aperture" or "opening"—a feature which Covidien correctly notes need not be round or oval in shape, but which does suggest a hole, or an area bounded on all sides by the finger loop structure. Various other "apertures" are depicted in the figures and described in the specification, and all are openings bounded on all sides by the surrounding component. E.g., Doc. No. 121-5 at 12-14, 31-32 (depicting and describing apertures [49], [62], [91], [97], and [101]).

Absent some evidence that mechanical engineers or persons otherwise skilled in the art interpret "loop" in a manner which broadly encompasses open, as well as closed, curves, the Court cannot endorse Covidien's proposal.

18

IV.     CONCLUSION

The claim terms at issue will be construed at trial and for all other purposes in this litigation in a manner consistent with the above rulings of the Court. The Court will entertain further argument regarding indefiniteness as to the disputed term from the '310 patent after the completion of discovery.

The Court will hold a status conference with all counsel after the completion of fact discovery, on October 11, 2018 at 2:30 PM in Courtroom 13.

SO ORDERED.

    /s/ Leo T. Sorokin
United States District Judge